UNITED STATES v. OREGON & C. R. CO. (eight cases).

(Circuit Court, D. Oregon. April 27, 1900.)

Nos. 2,272, 2,273, 2,388, 2,405, 2,422, 2,501, 2,560, 2,561.

1. PUBLIC LANDS—RAILROAD GRANTS—VESTING OF TITLE TO INDEMNITY LANDS.

    Under the land grants to the Oregon & California Railroad Company of July 25, 1866 (14 Stat. 239), and May 4, 1870 (16 Stat. 94), the former of which contains a provision that "when any of said alternate sections or parts of sections [within the boundaries of the primary grant] shall be

found to have been granted, sold, reserved, occupied by homestead settlers, pre-empted or otherwise disposed of, other lands designated as aforesaid shall be selected by said companies in lieu thereof under the direction of the secretary of the interior," within certain limits, and the latter of which contains an equivalent provision, the title to all lands in the indemnity class, notwithstanding the fact that it required all such lands to make up the deficiency in the primary grant, remained in the United States, subject to disposition and to rights acquired by settlers under the homestead and pre-emption laws, until the fact of a deficiency in the primary grant had been ascertained, and the indemnity lands in lieu thereof selected, and such selections approved by the secretary.

2. SAME—ERRONEOUS ISSUANCE OF PATENTS—SUIT BY UNITED STATES FOR CANCELLATION.

Where the land department has issued patents to a railroad company for lands to which settlers had acquired a prior right under the homestead and pre-emption laws, the United States is under an obligation to convey the lands to the rightful claimants, which gives it the right to maintain a suit in equity for the cancellation of such patents.

In Equity. Suits for the cancellation of patents to lands.

John H. Hall, U. S. Dist. Atty.

Wm. D. Fenton and Wm. Singer, Jr. (Wm. F. Herrin, of counsel), for defendant.

Thayer, St. Rayner & Schnabel, for homestead and pre-emption claimants.

BELLINGER, District Judge. These are suits to cancel patents issued by the United States to the defendant company, conveying the title to certain odd sections of land within the indemnity limits of the land grants made by congress to aid in the construction of the defendant's railroad from Portland to the southern boundary of Oregon, and of its road from Portland, on the west side of the Willamette river, to the town of McMinnville, in this state. The questions to be determined arise under two acts of congress granting the land to aid in the construction of said railroads,—one of July 25, 1866 (14 Stat. 239), known as the "East Side Grant," and the other of May 4, 1870 (16 Stat. 94), known as the "West Side Grant."

Section 2 of the act of July 25, 1866, provides:

"That there be, and hereby is, granted * * * every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile (ten on each side) of said railroad line, and when any of said alternate sections or parts of sections shall be found to have been granted, sold, reserved, occupied by homestead settlers, pre-empted or otherwise disposed of, other lands designated as aforesaid shall be selected by said companies in lieu thereof, under the direction of the secretary of the interior, in alternate sections designated by odd numbers as aforesaid, nearest to and not more than ten miles beyond the limits of said first named alternate sections, and as soon as said companies, or either of them, shall file in the office of the secretary of the interior a map of the survey of said railroad or any portion thereof, not less than sixty continuous miles from either terminus, the secretary of the interior shall withdraw from sale public lands herein granted on each side of said railroad, so far as located, and within the limits before specified."

The act of May 4, 1870, after making grant of lands within the primary limits of the road, provides as follows:

"And in case the quantity of ten full sections per mile cannot be found on each side of said road, within the said limits of twenty miles, other lands des-

ignated as aforesaid, shall be selected under the direction of the secretary of the interior on either side of any part of said road nearest to and not more than 25 miles from the track of said road to make up such deficiency."

The suit is brought by the United States for the benefit of some 30 pre-emption and homestead claimants who settled upon the lands in question after the defendant's map of survey or definite location of its railroad was filed with and accepted by the secretary of the interior, and after the railroad had been constructed, and accepted by the United States, but before the company filed its lists of selections in the local land office. Those who had thus made settlement upon these lands were in actual occupation of the same at the time the defendant's selections thereof were filed and approved for patenting; and after such selections had been filed and approved for patenting by the land office, but within 90 days of the filing of the official plat of survey of the lands, the settlers applied to file pre-emption and homestead claims therefor. But, regardless of these claims, the government issued its patents to the railroad company. Some of these settlements were begun as early as 1853, and nearly one-half of the claimants have been in possession of their respective tracts more than 20 years. All have made improvements, the amount of which in some cases is of the agreed value of $3,000.

There is a well established distinction between "granted lands" and "indemnity lands" in the construction of land grants in aid of railroads; and the principle is firmly established that the title to lands in the indemnity class does not vest in the railroad company, for the benefit of which they are contingently granted, but, in the fullest legal sense, remains in the United States, until they are actually selected and set apart, under the direction of the secretary of the interior, specifically for indemnity purposes. Until such time the title remains in the government, subject to its disposal at its pleasure. Grinnell v. Railroad Co., 103 U. S. 739, 26 L. Ed. 456; St. Paul & S. C. R. Co. v. Winona & St. P. R. Co., 112 U. S. 720, 5 Sup. Ct. 334, 28 L. Ed. 872; Kansas Pac. R. Co. v. Atchison, T. & S. F. R. Co., 112 U. S. 414, 5 Sup. Ct. 208, 28 L. Ed. 794; Railroad Co. v. Herring, 110 U. S. 27, 3 Sup. Ct. 485, 28 L. Ed. 56; Barney v. Railroad Co., 117 U. S. 228, 6 Sup. Ct. 654, 29 L. Ed. 858; Sioux City & St. P. R. Co. v. Chicago, M. & St. P. Ry. Co., 117 U. S. 406, 6 Sup. Ct. 790, 29 L. Ed. 928; U. S. v. Missouri, K. & T. Ry. Co., 141 U. S. 374, 12 Sup. Ct. 13, 35 L. Ed. 766. The defendant undertakes to distinguish this case from those cited, upon the authority of the case of St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 1, 11 Sup. Ct. 389, 35 L. Ed. 77. That was a case of contest between two railroad companies, and it was held that the exception in the grant to the Northern Pacific Railroad Company of all subsequent grants prior to the definite location of its road was not intended to cover other grants for the construction of roads of a similar character. And in that connection the court say there was no occasion for the exercise of the judgment of the secretary of the interior in selecting indemnity lands, as all the lands within the indemnity limits only made up in part for the deficiency. The distinction which is sought to be established is based upon this conclusion of the court,—that there was no occasion in that case for the exercise

of the judgment of the secretary of the interior in selecting indemnity lands,—and upon the application made of this case in the late case of Railroad Co. v. Groeck, 31 C. C. A. 334, 87 Fed. 970. In the case last referred to, the company had accepted the terms of the grant, and fixed the general route of its road as contemplated by the act, and filed a map thereof in the office of the commissioner of the general land office, which had been approved, and in pursuance of which the secretary of the interior withdrew the odd sections of land, including the land in controversy, from sale or location, pre-emption, or homestead entry. Thereafter the secretary revoked the order of withdrawal, which order of revocation was subsequently suspended. The defendant's title was initiated and was procured at the time the lands had been restored by the setting aside of the order of withdrawal. The court was of the opinion that the subsequent cancellation of the order of withdrawal did not authorize the defendant's pre-emption, which was nevertheless in violation of law and right. But the court further held that in the case of such a grant as that under consideration the terms of the grant itself operated to withdraw the indemnity lands from settlement from the moment when a map of the general route of the road was made and filed. In support of the conclusion reached the court also cited the case of St. Paul & S. C. R. Co. v. Winona & St. P. R. Co., 112 U. S. 720, 5 Sup. Ct. 334, 28 L. Ed. 872. That was also a case of conflict between two railroad grants which overlapped, and it was held, as in the cases above cited, that, in case of lieu lands, neither priority of grant nor priority of location nor priority of construction gives priority of right, but that this is determined by priority of selection, when the selection is made according to law. I do not think that the court intended, in the case of Railroad Co. v. Groeck, to establish a new rule for cases of this kind, based upon a distinction between cases where all the lands within the indemnity limits do not more than make up for the deficiency in the primary grant, and cases where the lands within the indemnity limits are more than enough for such deficiency. It has been the uniform policy of the government to permit settlement upon indemnity lands,—lands contingently granted to aid in the construction of railroads; and this policy has been extended to lands within the primary limits of such grants, by an act passed in 1876 (19 Stat. 35), which provides for confirmation of all homestead and pre-emption entries made in good faith by actual settlers, upon tracts of not more than 160 acres within the limits of any land grant, prior to the time when notice of the withdrawal of the lands embraced in the grant is received at the local land office. It can make no difference in any case that it turns out that all the odd-numbered sections within the indemnity limits are not more than are required to make up the deficiency in the primary grant. How is the fact to be known? It must be ascertained in some manner. Some action by the secretary of the interior is necessary in order to determine it, and there must be public information of the fact when it is determined, so that the interested public may be advised. The only means provided for is that of selections to be made by the secretary. In this connection the opinion of the court in Wisconsin Cent. R.

Co. v. Price Co., 133 U. S. 496, 10 Sup. Ct. 341, 33 L. Ed. 687, has direct application: ·

"He [the secretary] was required to determine, in the first place, whether there were any deficiencies in the land granted to the company which were to be supplied from indemnity lands; and, in the second place, whether the particular indemnity lands selected could be properly taken for those deficiencies. In order to reach a proper conclusion on these two questions, he had also to inquire and determine whether any lands in the place limits had been previously disposed of by the government, or whether any pre-emption or homestead rights had attached before the line of the road was definitely fixed. There could be no indemnity unless a loss was established. * * * Until the selections were approved there were no selections in fact,—only preliminary proceedings taken for that purpose,—and the indemnity lands remained unaffected in their title. Until then the lands which might be taken as indemnity were incapable of identification; the proposed selections remained the property of the United States. The government was, indeed, under a promise to give the company indemnity lands in lieu of what might be lost by the causes mentioned. But such promise passed no title, and, until it was executed, created no legal interest which could be enforced in the courts."

The words employed in the two granting acts in the cases in question remove all doubt, if there is otherwise room for doubt:

"And when any of said alternate sections or parts of sections shall be found to have been granted, sold, reserved, occupied by homestead settlers, pre-empted, or otherwise disposed of, other lands, designated as aforesaid, shall be selected by said companies in lieu thereof, under the direction of the secretary of the interior," etc.

· Such is the language employed in the act of 1866. That employed in the act of 1870 is of like effect:

"And in case the quantity of ten full sections per mile cannot be found on each side of said road, within the said limits of twenty miles, other lands designated as aforesaid, shall be selected under the direction of the secretary of the interior," etc.

There is no room to argue that the secretary is not required by the circumstances of the case to make selections, when he is so required by the mandate of the two granting acts. And these "selections" are indispensable to the operation of the grant within the indemnity limits. It does not otherwise attach to any lands within these limits, and had not so attached at the date of the homestead and pre-emption settlements made by the settlers for whose benefit this suit is brought. ,

I am of the opinion that these suits are properly brought by the United States; that the contention that, when an equitable title is claimed by the homesteader and pre-emptioner, the government has no actionable interest, cannot be sustained. The case of U. S. v. Missouri, K. & T. Ry. Co., 141 U. S. 358, 12 Sup. Ct. 13, 35 L. Ed. 766, is decisive of the question. That was a case in which the decision of the court was based upon the conclusion that the patents held for cancellation included lands which equitably belonged to bona fide settlers, whose rights had been acquired under the homestead and pre-emption laws. As to some of the interests in that case the jurisdiction was maintained on the ground that the United States was under an obligation to claimants under the homestead and pre-emption laws to undo the wrong alleged to have been done by its officers in issuing patents to the company, and thereby enable

it to properly administer these lands, and give clear title to those whose rights were superior to those of the railway company. It is true that as to some of the lands it appeared from the averments of the bill that the United States had a direct interest, but, as just stated, this was true as to only a part of the lands in question. The jurisdiction was maintained in that case, as it must be in this, upon the ground that there existed on the part of the United States an obligation to issue patents to the rightful owners of the lands in question, and that they could not perform this obligation until the patents complained of were annulled. The court further says that these principles equally apply where patents have been issued by mistake, and they are specially applicable where a multiplicity of suits, each one depending upon the same facts and upon the same questions of law, can be avoided, and where a comprehensive decree, covering all contested rights, would accomplish the substantial ends of justice. These considerations have application in the case on trial. There must be a decree as prayed for in the bill in cases Nos. 2,272, 2,273. In cases Nos. 2,405, 2,422, 2,560, 2,561, the pleas to the bill are overruled. In cases Nos. 2,388 and 2,501, the demurrers are overruled.